Howard T. Hogan, J.
This is a consolidated tax certiorari proceeding involving the assessed valuation placed upon an improved parcel of land during the tax years 1968, 1969 and 1970.
The parties have stipulated as to the ratio of assessed valuation to full value, so that the only issue is whether the property was assessed unequally for the years in question, and the ultimate question involved is the full value of the property on the respective tax status dates, May 1, 1967, May 1, 1968 and May 1,1969.
The tax lot under review (rectangular in shape) contains approximately 61,360 square feet. It enjoys 208 feet of frontage on a marginal or service road adjacent to the major east-west artery known as Bethpage Turnpike (Hempstead-Farmingdale Turnpike) in Levittown. It is improved with a two-story mezzanine and basement department store structure containing 55,000 square feet on each floor and a total of 180,000 square feet.
The conclusions of the two real estate experts, and the assessed valuation transposed into full value, demonstrate the following comparison:
PETITIONER ASSESSOR RESPONDENT
May 1, 1967.......... $1,770,000 $2,380,800 $2,565,000
May 1, 1968.......... $1,700,000 $2,380,800 $2,724,150
May 1, 1969.......... $1,630,000 $2,480,000 $2,853,350
Both parties utilized the services of building experts who estimated the sound value of the improvements, which was thereupon adopted by their respective real estate appraisers.
*497 The respective conclusions of the building experts are:
PETITIONER RESPONDENT
May 1, 1967 $3,366,489 Replacement Cost $3,196,350
-$1,475,195 Depreciation -$923,000
=$1,891,294 Sound Value =$2,273,350
May 1, 1968 $3,127,468 Replacement Cost $2,961,650
-$1,271,003 Depreciation -$772,500
=$1,856,465 Sound Value =$2,189,150
May 1, 1969 $2,938,945 Replacement Cost $2,732,450
-$1,100,635 Depreciation -$656,600
=$1,838,310 Sound Value =$2,075,850
From his sound value, the petitioner’s expert deducted an additional sum averaging $66,000 per year for functional obsolescence.
Generally speaking, the reports of the respondent’s expert are the more accurate with respect to replacement costs, and the court adopts those costs.
It appears that the cesspools servicing the property are located to the north of the subject parcel and in land that is now owned by the Town of Hempstead and utilized as a municipal parking lot. Originally the parking area had been part of the subject parcel but was dedicated to the town, the owner retaining only easements of access to the cesspools.
For tax purposes, should the pools be included as part of the improvements on the subject parcel?
Under section 102 of the Real Property Tax Law, real property is defined in paragraph (e) of subdivision 12 as including the following: “ (e). Mains, pipes and tanks permitted or authorized to be made, laid or placed in, upon, above or under any public or private street or place for conducting steam, heat, water, oil, electricity or any property, substance or product capable of transportation or conveyance therein or that is protected thereby ”.
While this section related to the facilities of a private utility company, it demonstrates that these are instances in which property not located upon a particular tax lot may be taxed in conjunction with the primary tax lot. See also paragraph (b) of subdivision 12 of section 102, which permits the taxation of bridges, wharves and piers.
There is no definitive section, however, which envisages the unique situation at bar. Here the parcel originally included adjacent land upon which the owner voluntarily located the sanitary facilities. Though that property was dedicated to the town, such dedication was subject to the rights of the petitioner to utilize the cesspools. Thus, the pools enhance the value of the depart *498 ment store building and, indeed, form an integral and functional part of the property under review.
Without sanitary facilities the structure under review would be valueless. The court cannot ignore the fact that the facilities are no longer on petitioner’s land solely as a result of an obvious business judgment to dedicate the land to the town. Neither may the court disregard the reflected value of the facilities under an economic approach, for it is their existence which helps generate the value of the structure.
For purposes of this proceeding, therefore, the court will consider the facilities as part of the structure to be valued.
While the subject of the now-dedicated parking lot is under discussion, it would be appropriate to pass upon another of petitioner’s contentions, namely, that since the dedication, petitioner’s property is no longer in conformity with the building zone ordinance, in that, the area covered by the building on the subject parcel exceeds the area requirement. Thus, petitioner argues, if the building were more than 50% destroyed by fire, the structure could not be rebuilt but a new and smaller building would have to be erected in conformity with the ordinance.
The fact that a parcel of land is put into a nonconforming situation as a result of a partial taking in eminent domain may be considered in estimating damages sustained as a result of that taking. (See 4 Nichols, Eminent Domain, 1970 Cum. Supp., p. 305, citing Schuh v. State, 241 N. E. 2d 362 [Ind.].)
The situation in this tax certiorari proceeding, however, is not the result of an acquisition by the Government, but rather a self-created circumstance generated by the business judgment to dedicate the parking lot to the town. As a result of the dedication, the exclusive right , to the parking area is relinquished, as are the duties of maintenance. While the lot must now service all shoppers including those of petitioner, it is painted, patrolled, repaired, cleaned (including snow removal) and fully maintained by the town.
If, at some future time, a calamity occurs to destroy the building and if, at that time, the municipality will not permit rebuilding, then the petitioner could apply to have its assessment reviewed in light of the catastrophe. However, on each of the tax status dates, the structure was sound, adequately suited to its site, and must be valued in such state, giving very little weight to the speculative hypothesis of possible destruction. In that regard, it should be observed that this is basically a fireproof structure, containing a sprinkler system and maintained with security personnel usually found in department stores.
*499 Resuming the discussion under the cost approach, the main issue involved depreciation. Petitioner’s expert found a weighted average depreciation of 43.82% in May of 1969, 40.64% in 1968 and 37.45% in 1967.
Respondent’s expert found an over-all depreciation rate of 2.10% per annum or 28.0% for the final year under review. Petitioner’s expert found a rate of 3.18%% per year. While it is true that the building is in good condition, the court finds that respondent’s 2% factor is inadequate to reflect the actual condition of the property. For example, his depreciation allowed for the roof of this 1955 building was 50%, though he agreed it would have to be replaced in 7 years.
Claimant’s expert found additional obsolescence due to the fact that the existing structure had excess toilet facilities, plaster ceilings instead of acoustical tiling, and sheetrock partitions. The court is not convinced that there is a surplusage of toilets for this structure that has housed as many as 715 employees alone. While there may be one or two extra facilities under the formula utilized, this difference would not substantially affect the building cost.
In this court’s opinion, petitioner’s rate of depreciation adequately covers both physical depreciation and functional obsolescence. Applying these rates to the petitioner’s reconstruction costs results in the following indications of sound value:
REPLACEMENT DEPRECIATION SOUND
COST RATE VALUE
May 1, 1967............ $2,732,450 37.45% $1,709,150
May 1, 1968............ $2,961,650 40.64% $1,758,035
May 1, 1969............ $3,196,350 43.82% $1,795,710
With respect to land value, petitioner’s real estate expert found a unit land value of $3.25 per square foot or $200,000 for the entire parcel for the first year under review, which amount he increased by 10% each year to $220,000 and $240,000 in the succeeding years.
Respondent’s expert found a unit value of $8 per square foot for the first year, $8.75 for the second and $9.50 for the last, or values of $490,000, $535,000 and $580,000 for the entire parcel in the respective years under review.
The difference is generated by the varying treatment of the adjacent municipal parking area. Respondent made an adjustment for this benefit by a factor of +2% times the indicated value of the land value. His theory was' that in order to build a structure of the magnitude of the subject parcel, the land area requirement wpuld be an additional 210,000 square feet of “on *500 premises ” parking. Since such requirement was served by the municipal field, he adjusted each comparable sale by 2% times.
There are in the record, however, no comparable sales of department store properties adjacent to municipal parking lots tending to support the 250 % adjustment. The court agrees with the petitioner that the contiguity with a municipally owned and maintained parking field generates substantial value to any property and that the comparable sales must be adjusted to reflect this difference. Instead of a factor of 250%, however, the court finds a factor of 50% to be a fair gauge of this adjustment.
Thus, the value per square foot for the subject parcel is found to be $4.90 in the first year, $5.30 for the second, and $5.85 for the final year under review.
Multiplying these values by the 61,360 square feet contained in the subject parcel, and adding the sound value of the structures, result in the following values under the cost approach:
LAND BUILDING VALUE
May 1, 1967............ $300,664 $1,709,150 $2,009,814
May 1, 1968............ $325,208 $1,758,035 $2,083,243
May 1, 1969............ $358,956 $1,795,710 $2,154,666
Under the economic approach, the petitioner’s expert capitalized an estimated annual net income of $287,400 under a building residual approach and arrived at resultant values of $1,770,000, $1,700,000 and $1,630,000 for the respective years under review.
Respondent’s expert found estimated net rentals of $205,000, $235,000 and $260,000, which he capitalized at over-all rates of .08, .085 and .09 for the years under review. His resultant values were $2,565,000, $2,764,705, and $2,888,888 for the respective years at issue.
Petitioner’s comparable rentals were of much smaller stores than the subject parcel, and few had second floors or basements. In addition, most were of short-term leases.
The.court finds that respondent’s estimates of net rental value are accurate for the years in question. Since it appears that in this type of store rental the tenant customarily pays the real estate taxes, the court also agrees with respondent’s expert that such payment should be disregarded in computing net rental and that capitalization of the tax rate is not necessary under this procedure.
The court finds, however, that the over-all capitalization rate selected by the respondent’s expert is a bit modest. Petitioner’s findings generate an over-all rate of 11.02% in 1967, 11.04% in 1968 and 11.05% for the last year under review.
*501 The court finds that 9% is a fair over-all capitalization rate in the first year under review and that 10% and 11% are fair rates in the remaining years.
Applying these rates to respondent’s income results in the following findings of value under the economic approach:
TAX STATUS DATE
May 1, 1967
May 1, 1968
May 1, 1969
OVEB-ALL VALUE
$2,277,777
$2,350,000
$2,363,636
Since, in each instance, the economic value exceeds the value under the cost approach, it is the latter theory which must govern (People ex rel. Manhattan Sq. Beresford v. Sexton, 284 N. Y. 145).
Accordingly, applying the stipulated ratios to the full values indicated by the cost approach, the court finds the following rounded indicated assessed values for each of the years in question:
LAND TOTAL
May 1, 1967........... $100,220 $669,940
May 1, 1968........... $108,400 $694,410
May 1, 1969........... $114,865 $689,490
The respondent is directed to reduce the assessed valuations for the respective years accordingly.